**WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP**
DON SPRINGMEYER, ESQ.
Nevada Bar No. 1021
DANIEL BRAVO, ESQ.
Nevada Bar No. 13078
3556 E. Russell Road, Second Floor
Las Vegas, Nevada 89120
(702) 341-5200 / Fax: (702) 341-5300
dspringmeyer@wrslawyers.com
dbravo@wrslawyers.com

*(Additional Counsel on Signature Page)*

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| JAMIE PETTY, | Case No.: 2:18-cv-01323-JAD-VCF |
| Plaintiff, | |
| vs. | **FIRST AMENDED COMPLAINT** |
| STEPHEN WILL ASHCROFT and ROBERT CAPUTO, | **JURY TRIAL DEMANDED** |
| Defendants. | |

1.      This case centers on the cruel acts of two partners, Defendants Stephen Will Ashcroft and Robert Caputo, against their third partner, Plaintiff Jamie Petty.

2.      Mr. Petty is a citizen of the United Kingdom.  Mr. Petty has spent his career in the business and consulting industries.  Through his extensive network of relationships, Mr. Petty has helped secure hundreds of millions of dollars in capital to finance entrepreneurial enterprises around the globe.

3.      One of those enterprises is Blue Skies—a private aviation company that is revolutionizing the private jet industry by combining service offerings that are unique in the market.  Beginning in early-2017, Mr. Petty played a critical role in developing the business model of Blue Skies.  And, Mr. Petty leveraged his personal network to arrange investment

banking and funding opportunities for the embryonic company.  Mr. Petty's efforts paid off.  In February of 2018, Blue Skies stood poised to finalize an initial capital investment deal worth potentially hundreds of millions of dollars (which, upon information and belief, has occurred).

4.      On February 5, 2018, however, Ashcroft called and emailed Mr. Petty to deliver a callous message of betrayal: "you will have no role at Blue Skies Group (BSG)."  And notwithstanding Mr. Petty's equity stake in Blue Skies as an officer, Ashcroft stated that he and Caputo acting alone would discuss Mr. Petty's "potential employment, if any and discuss with you any remuneration we feel you are due."  To date, Ashcroft and Caputo have refused to engage in further discussions relevant to the February 5, 2018 communications.

5.      Given no other option, on February 26, 2018, Mr. Petty brought suit against Blue Skies Group, LLC, Blue Skies Aviation Group Holdings LLC, Ashcroft, and Caputo (the "Original Lawsuit").[1]

6.      Immediately thereafter, Ashcroft and Caputo began (or continued) their campaign to defame, intimidate, harass, and financially ruin Mr. Petty.  For example, Ashcroft and Caputo made defamatory statements that injured Mr. Petty in his business.  These defamatory statements were made to investors and investor managers of the Blue Skies Entities, as well as unrelated individuals.  Also, Ashcroft and Caputo commissioned a firm to access Mr. Petty's computers, email accounts, telephones, and/or bank accounts and then create a report of the results.

7.      As a result of the above conduct (and other conduct), Mr. Petty has suffered extreme distress, including sleeplessness, irritability, stress, and depression.  Mr. Petty also experiences severe headaches and stomachaches.  For the first time, Mr. Petty has been diagnosed with high blood pressure, which was recorded on or about February of 2018 by a doctor.  Mr. Petty is scheduling additional doctor appointments related to above.

8.      In addition, Mr. Petty had to relocate with his family to the United States of America as it was impossible to stop the process that was initiated when the three partners and

---

[1]   Blue Skies Group, LLC, Blue Skies Aviation Group Holdings, LLC, and any other related entity are referred to in this First Amended Complaint as the "Blue Skies Entities."

co-founders agreed that the Blue Skies Entities would pay (one way or another) for the relocation. Given the events that have transpired as a result of Defendants' conduct, Mr. Petty has been unable to work in the United States or obtain a visa that he would have likely received if working for the Blue Skies Entities.

9. Again, given no other option, Mr. Petty has been forced to bring this lawsuit for slander *per se* and intentional infliction of emotional distress against Ashcroft and Caputo.

### The Parties

10. Plaintiff Jamie Petty is a citizen of the United Kingdom and resides in New York City, New York.

11. Upon information and belief, Defendant Stephen Will Ashcroft resides in Boulder, Colorado or Miami, Florida.

12. Upon information and belief, Defendant Robert Caputo resides in Harrison, New York.

### Jurisdiction and Venue

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and nations. Further, the amount in controversy far exceeds $75,000. The damage to Mr. Petty's career alone totals more than $75,000.

14. This Court has specific personal jurisdiction over Defendants Ashcroft and Caputo because both have sufficient contacts with the state of Nevada (including being members of at least one Nevada limited liability company).

15. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

### Facts Common to All Counts

16. Jamie Petty is an accomplished international businessman. Throughout the course of his career in the financial services and telecom industries, Mr. Petty built an extensive network of contacts and associations, many of which specialize in raising or making loans of

3

private equity to finance dynamic startups.  Mr. Petty relies on his reputation to generate new business opportunities and for the introduction of same to potential funding partners via his network.  As of February of 2018, Mr. Petty has helped raise hundreds of millions of dollars to finance various entrepreneurial enterprises around the globe.  But, after February of 2018, Mr. Petty has been unable to raise any money.

17.  Mr. Petty met Ashcroft and Caputo in early-2017, and all three continued to develop the private aviation platform that became the Blue Skies Entities, with the ultimate aim of offering a superior flying experience at a lower passenger cost, by taking advantage, among other areas, of declining private jet resale costs.  Upon information and belief, the Blue Skies Entities have built a large fleet of private jets and helicopters.  Upon information and belief, the Blue Skies Entities offer service throughout North America, with further expansion to overseas markets contemplated.  Upon information and belief, members pay competitive low monthly fees and in exchange would be entitled to guaranteed round-trip fares on available aircraft.

18.  Mr. Petty's role in forming the Blue Skies Entities also included securing funding, and Mr. Petty did this by reaching out to his extensive network.  Through his network, Mr. Petty helped introduce the Blue Skies Entities to several investment banking advisors who would be able to market the investment opportunity to private equity investors.  Ultimately, the Blue Skies Entities engaged one of those advisors, Stifel Nicolaus ("Stifel").  Mr. Petty worked closely with management and the advisors at Stifel to further develop a plan that would attract significant investment.  That effort has paid off.  In February 2018, the Blue Skies Entities stood poised to complete a funding agreement that may ultimately be worth hundreds of millions of dollars (which, upon information and belief, has occurred).  The contemplated capital infusion will ensure the company's launch and immediate growth (which, upon information and belief, has occurred).

19.  Further, Mr. Petty leveraged his network to introduce the Blue Skies Entities to Ben Tubey, the CEO of Piptook, which was an investment opportunity for the Blue Skies Entities.  Piptook is a data analytics business concentrating on social media marketing.  Upon

4

1   information and belief, Piptook also has the ability to generate detailed reports about individuals.

2       20.    Recognizing that Mr. Petty would play a significant role in the establishment of

3   the Blue Skies Entities and their future development, Ashcroft and Caputo made Mr. Petty a full

4   equity partner in the contemplated Blue Skies group in late-2017.[2]  The three partners and co-

5   founders agreed that Mr. Petty would serve as the Chief Commercial Officer of the Blue Skies

6   Entities, and, having spoken to a number of outside sources, the partners and co-founders also

7   agreed each would receive the same reward package (including a salary of $350,000).  Finally,

8   all three agreed that the Blue Skies Entities would pay (one way or another) to relocate Mr. Petty

9   and his family from London to New York City.

10       21.    However, on February 5, 2018, Ashcroft called Mr. Petty.  During the phone call,

11   Ashcroft communicated to Mr. Petty that he was being stripped of his position and equity in the

12   company.  Ashcroft accused Mr. Petty of trying to work a "side deal"—an allegation that is

13   categorically false.  And he further claimed that Mr. Petty had demonstrated that his interests

14   were not aligned with the company.

15       22.    As Mr. Petty explained to Ashcroft during the phone conversation, since agreeing

16   to serve as a partner and officer of the Blue Skies Entities, Mr. Petty has at all times placed the

17   interests of the company before his own and has fully complied with his obligations to the Blue

18   Skies Entities and his fellow members and officers.

19       23.    Following the phone conversation, Ashcroft emailed Mr. Petty to confirm the

20   substance of the conversation.  The email provided written notice that Ashcroft and Caputo were

21   unlawfully seeking to strip Mr. Petty of his position and equity.

22       24.    In the email, Ashcroft stated:  "you will have no role at Blue Skies Group."  And

23   notwithstanding Mr. Petty's equity stake in Blue Skies position as an officer, Ashcroft stated that

24   he and Caputo acting alone would discuss Mr. Petty's "potential employment, if any and discuss

25

26       [2]   Caputo and Ashcroft played games with the documents for formation of the Blue Skies Entities.  However, the documents show, at least, that the three men share ownership of Blue

27   Skies Aviation Group Holdings, LLC (although the percentage of such ownership is in dispute).

28

1  with you any remuneration we feel you are due."

2      25.     To date, Ashcroft and Caputo have refused to engage in further discussions

3  relevant to the February 5, 2018 communications.

4      26.     To be clear, Mr. Petty's interests were always aligned with those of the Blue Skies

5  Entities.

6      27.     As such, given no other option, on February 26, 2018, Mr. Petty brought suit

7  against Blue Skies Group, LLC, Blue Skies Aviation Group Holdings LLC, Ashcroft, and

8  Caputo.

9      28.     In retaliation, Ashcroft and Caputo began defaming, intimidating, harassing, and

10  threatening Mr. Petty.

11      29.     Caputo made defamatory statements that injured Mr. Petty in his business.  These

12  defamatory statements were made to investors and investor managers of the Blue Skies Entities

13  at the beginning of 2018.  Caputo told representatives of Stifel (upon information and belief, at

14  least, Michael Hart, Jonathan Abraham, and/or Stefan Walter) and Blackstone Group's GSO

15  Capital (upon information and belief, at least, Paulo Eapen) (or whichever other entity the Blue

16  Skies Entities ended up financing with via Stifel) that Mr. Petty was relieved of his position with

17  the Blue Skies Entities due to dishonesty, deceit, unprofessionalism, incompetence, etc., which is

18  false.  These false statements were published with malice, as Caputo had knowledge of falsity of

19  the defamatory statement and/or acted with reckless disregard for its truth (which is defined as

20  high degree of awareness of probable falsity of statement).  For example, Caputo knew that Mr.

21  Petty was not dishonest (or deceitful, unprofessional, or incompetent) as Mr. Petty put all his

22  efforts into forming Blue Skies, and his efforts were successful as Blues Skies eventually funded

23  with an investor that Mr. Petty secured.  Caputo even admitted to such—"Plaintiff introduced

24  Defendants to Stuart Cheek ("Mr. Cheek"), a veteran financial services provider located in the

25  UK, who began working with Blue Skies to obtain funding through bonds or private equity.  In

26  or about the fall of 2017, Mr. Cheek introduced Defendants to an investment advisor, Stifel

27  Nicolaus, who they worked closely with to further develop a plan that would attract significant

28

investment in the Blue Skies project. . . . Stifel was able to procure prospective funding from a private equity firm in early-2018." *See* Mot. to Dismiss, ECF No. 7 at 3.  Further, Caputo had motive to exclude Mr. Petty for any Blue Skies deal—more money for him.

30.    Ashcroft made defamatory statements that injured Mr. Petty in his business. These defamatory statements were made to investors and investor managers of the Blue Skies Entities at the beginning of 2018.  Ashcroft told representatives of Stifel (upon information and belief, at least, Michael Hart, Jonathan Abraham, and/or Stefan Walter) and Blackstone Group's GSO Capital (upon information and belief, at least, Paulo Eapen) (or whichever other entity the Blue Skies Entities ended up financing with via Stifel) that Mr. Petty was relieved of his position with the Blue Skies Entities due to dishonesty, deceit, unprofessionalism, incompetence, etc., which is false.  Ashcroft also falsely stated to these representatives that Mr. Petty entered into a side deal.  These false statements were published with malice, as Ashcroft had knowledge of falsity of the defamatory statement and/or acted with reckless disregard for its truth (which is defined as high degree of awareness of probable falsity of statement).  For example, Ashcroft knew that Mr. Petty was not dishonest (or deceitful, unprofessional, or incompetent) as Mr. Petty put all his efforts into forming Blue Skies, and his efforts were successful as Blues Skies eventually funded with an investor that Mr. Petty secured.  Ashcroft even admitted to such— "Plaintiff introduced Defendants to Stuart Cheek ("Mr. Cheek"), a veteran financial services provider located in the UK, who began working with Blue Skies to obtain funding through bonds or private equity.  In or about the fall of 2017, Mr. Cheek introduced Defendants to an investment advisor, Stifel Nicolaus, who they worked closely with to further develop a plan that would attract significant investment in the Blue Skies project. . . . Stifel was able to procure prospective funding from a private equity firm in early-2018." *See* Mot. to Dismiss, ECF No. 7 at 3.  Further, Ashcroft had motive to exclude Mr. Petty for any Blue Skies deal—more money for him.

31.    Caputo also made false statements about Mr. Petty to Benjamin Tubey.  These false statements included that Mr. Petty was endangering investment deals in Blue Skies due to

his greed and that Mr. Petty had been removed from Blue Skies because Mr. Petty lied about a side deal.  These false statements were made on or about February 26th and 27th of 2018. Again, these false statements were published with malice, as Caputo had knowledge of falsity of the defamatory statement and/or acted with reckless disregard for its truth (which is defined as high degree of awareness of probable falsity of statement).  For example, Caputo knew that Mr. Petty was not greedy or dishonest (or deceitful, unprofessional, or incompetent) as Mr. Petty put all his efforts into forming Blue Skies, and his efforts were successful as Blues Skies eventually funded with an investor that Mr. Petty secured.  Caputo even admit to such—"Plaintiff introduced Defendants to Stuart Cheek ("Mr. Cheek"), a veteran financial services provider located in the UK, who began working with Blue Skies to obtain funding through bonds or private equity. In or about the fall of 2017, Mr. Cheek introduced Defendants to an investment advisor, Stifel Nicolaus, who they worked closely with to further develop a plan that would attract significant investment in the Blue Skies project. . . . Stifel was able to procure prospective funding from a private equity firm in early-2018." *See* Mot. to Dismiss, ECF No. 7 at 3. Further, Caputo knew there was no side deal between Mr. Petty and Mr. Cheek or anyone else.

32.     Caputo also threatened Mr. Petty through Mr. Tubey.  For example, during the same time period as above, Ashcroft stated that the Blue Skies Entities would sue Mr. Petty if the deal did not fund and that would prohibit Mr. Petty from being able to work or travel to the United States.  Further, Caputo provided that Mr. Petty would be risking everything (including the above) if he did not take Caputo's new deal that included less equity and less salary than had been promised to Mr. Petty (and contracted) and was what he deserved.

33.     As such, Mr. Petty received a number of telephone calls and text messages from Mr. Tubey, who had been contacted by Caputo to pass on several messages to Mr. Petty so that Mr. Petty would dismiss his Original Lawsuit and give up his interest in the Blue Skies Entities or face serious consequences from Defendants and the Blue Skies Entities.

34.     Ashcroft and Caputo commissioned a firm (i.e., Piptook) to access Mr. Petty's computers, email accounts, telephones, and/or bank accounts to generate a report about Mr.

Petty.  Upon information and belief, Ashcroft and Caputo have used (and are using) that report to intimidate Mr. Petty to dismiss his Original Lawsuit and give up his interest in the Blue Skies Entities, among other things.

35.    Further, Ashcroft has retained Mr. Petty's email address at the Blue Skies Entities and has monitored incoming emails.

36.    Also, Ashcroft repeated false statement regarding Mr. Petty to Damian Roberts, most likely around the same time period.  In more detail, Ashcroft stated that Mr. Petty struck a side deal with Mr. Cheek and that Mr. Petty was removed from the Blue Skies Entities because of this side deal and lack of professionalism.  For the reasons stated above, these statements are not only false but made with malice.

37.    As a result of the above conduct (and other conduct), Mr. Petty has suffered extreme distress, including sleeplessness, irritability, stress, and depression.  He now has been diagnosed with high blood pressure, which was recorded on or about February of 2018 by a doctor.  Further, Mr. Petty had to relocate (with his family) to the United States as it was impossible to stop the process that was initiated when the three partners and co-founders agreed that the Blue Skies Entities would pay (one way or another) for Mr. Petty's relocation from London to New York City.  Mr. Petty has been unable to work in the United States because, among other things, Ashcroft and Caputo's defamatory statements and the inability to obtain a visa that Mr. Petty would have applied for and likely received if working for the Blue Skies Entities.

## Count 1: Slander Per Se (against Ashcroft and Caputo)

38.    Mr. Petty hereby restates and realleges the allegations set forth in paragraphs 1 through 37 above and incorporates them by reference.

39.    Defendants' statements, discussed above, are false.  For example, Mr. Petty was never dishonest, greedy, deceitful, unprofessional, or incompetent with respect to Defendants or the Blue Skies Entities and there was never a side deal with Mr. Cheek or with anyone else.  In other words, Mr. Petty, at all times, had placed the interests of the Blue Skies Entities before his

own and has fully complied with his obligations to the Blue Skies Entities and his fellow members and officers.

40.     The slanderous statements constitute slander per se because they impugned Mr. Petty's lack of fitness for trade, business, or profession and/or tend to injure Mr. Petty in his business.

41.     Defendants did not have a privilege that entitled them to make the defamatory statements.  To the extent that an such privilege existed, as discussed above, Defendant abused the privilege by acting with actual malice (i.e., the statements were published with knowledge that they were false or with reckless disregard for their veracity).

42.     Defendants also acted negligently, recklessly, and/or intentionally when making the false statements set forth above.  Defendants either knew or should have known in the exercise of ordinary care that the statements were false.

43.     Because the Defendants' statements are false and defamatory per se, the damages to Mr. Petty are presumed as a matter of law.

44.     As a direct and proximate result of the statements, Mr. Petty's reputation, among other things, has been severely injured, and has suffered damages in an amount to be proven at trial, but in any event, in excess of $75,000.

45.     Defendants acted with malice, conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights of others, and or oppression.  Plaintiff is entitled to an award of punitive damages to punish Defendants for their unlawful conduct and to deter them from repeating such misconduct in the future.

46.     Defendants are joint tortfeasors and are jointly and severally liable for the false and defamatory statements set forth herein.

47.     Further, it has been necessary for Plaintiff to incur costs and to retain counsel in order to prosecute this action, and Plaintiff should be awarded his attorneys' fees and costs.

**Count 2: Intentional Infliction of Emotional Distress (against Ashcroft and Caputo)**

48.     Mr. Petty hereby restates and realleges the allegations set forth in paragraphs 1

through 47 above and incorporates them by reference.

49. As demonstrated above, Defendants engaged in extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress.

50. As demonstrated above, Plaintiff suffered severe and extreme emotional distress. Among other things, Mr. Petty has suffered extreme distress, including sleeplessness, irritability, stress, and depression.  Mr. Petty also suffers daily from severe headaches and stomachaches. For the first time, Mr. Petty has been diagnosed with high blood pressure, which was recorded on or about February of 2018 by a doctor.  The doctor also told Mr. Petty that the high blood pressure was a cause of his working situation.  Mr. Petty is scheduling additional doctor appointments related to above.

51. Defendants conduct was intentional and designed to cause severe emotional distress.

52. As an actual and proximate result of Ashcroft's and Caputo's conduct, Mr. Petty has sustained such distress, and has suffered damages in an amount to be proven at trial, but in any event, in excess of $75,000.

53. Defendants acted with malice, conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights of others, and or oppression.  Plaintiff is entitled to an award of punitive damages to punish Defendants for their unlawful conduct and to deter them from repeating such misconduct in the future.

54. Defendants are joint tortfeasors and are jointly and severally liable for the extreme and outrageous conduct set forth herein.

55. Further, it has been necessary for Plaintiff to incur costs and to retain counsel in order to prosecute this action, and Plaintiff should be awarded his attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Petty prays for judgment against Defendants as follows:

A. Entry of judgment in favor of Mr. Petty and against Defendants, jointly and severally, on all claims for relief;

B.     An Order awarding Mr. Petty compensatory damages he has sustained in an amount to be proven at trial, but in any event, in excess of $75,000, as a result of Defendants' slander;

C.     An Order awarding Mr. Petty compensatory damages he has sustained in an amount to be proven at trial, but in any event, in excess of $75,000, as a result of Defendants' intentional infliction of emotional distress;

D.     An Order awarding Mr. Petty punitive damages to punish and deter Defendants in in an amount to be determined by the enlightened conscience of the jury;

E.     That Mr. Petty recover his reasonable attorneys' fees and expenses from Defendants; and

F.     Any and all other legal and equitable relief as may be available under law that the Court may deem proper.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

## **<u>DEMAND FOR JURY TRIAL</u>**

2   Mr. Petty demands a trial by jury for all issues so triable.

3   DATED this 27th day of August, 2018

4   WOLF, RIFKIN, SHAPIRO,
    SCHULMAN & RABKIN, LLP
5

6   By: _____/s/ Don Springmeyer, Esq._____
        Don Springmeyer, Esq.
7       Nevada Bar No. 1021
        Daniel Bravo, Esq.
8       Nevada Bar No. 13078
        WOLF, RIFKIN, SHAPIRO,
9       SCHULMAN & RABKIN, LLP
        3556 E. Russell Road, Second Floor
10      Las Vegas, Nevada 89120
        (702) 341-5200 / Fax: (702) 341-5300
11      dspringmeyer@wrslawyers.com
        dbravo@wrslawyers.com
12
        Warren T. Burns, Esq. (*Pro Hac to be Submitted*)
13      LeElle Krompass, Esq. (*Pro Hac to be Submitted*)
        Mallory Biblo, Esq. (*Pro Hac to be Submitted*)
14      BURNS CHAREST LLP
        5900 Jackson Street, Suite 500
15      Dallas, Texas 75202
        Telephone: (469) 904-4550
16      Facsimile: (469) 444-5002
        wburns@burnscharest.com
17      lkrompass@burnscharest.com
        mbiblo@burnscharest.com
18
        Korey A. Nelson, Esq. (*Pro Hac to be Submitted*)
19      BURNS CHAREST LLP
        365 Canal Street, Suite 1170
20      New Orleans, Louisiana 70130
        Telephone: (504) 799-2845
21      Facsimile: (504) 881-1765
        knelson@burnscharest.com
22
        *Attorneys for Plaintiff*
23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2     I hereby certify that on this 27th day of August, 2018, a true and correct copy of **FIRST**

3 **AMENDED COMPLAINT** was served via the United States District Court CM/ECF system on

4 all parties or persons requiring notice.

5

6                         By:   */s/ Christie Rehfeld*

7                             Christie Rehfeld, an Employee of
WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28